**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**LENA SUZANNE ROSEBERRY,**

      **Plaintiff,**

**v.**                           **Case No.: 3:15-cv-04895**

**CAROLYN W. COLVIN,
Acting Commissioner of the Social
Security Administration,**

      **Defendant.**

**MEMORANDUM OPINION**

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.   Procedural History

Plaintiff Lena Suzanne Roseberry ("Claimant") filed an application for SSI benefits on October 28, 2011, alleging a disability onset date of April 15, 2008, due to "right foot injury, back pain, leg pain, kidney stones, [and] depression." (Tr. at 141, 160). The Social

Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 75-79, 80-82). Claimant subsequently requested an administrative hearing, and on September 11, 2012, the SSA mailed to Claimant a written notice explaining the hearing process, including Claimant's right to representation at the hearing, along with a publication by the SSA regarding a claimant's right to representation in social security proceedings. (Tr. at 83-87). Claimant's initial hearing was held on June 14, 2013 before the Honorable Charlie Andrus, Administrative Law Judge ("ALJ Andrus"). (Tr. at 45-72). At the hearing, ALJ Andrus informed Claimant of her right to representation, and Claimant indicated that she understood her right to representation, but wished to proceed without a representative. (Tr. at 47-52). Before concluding the hearing, ALJ Andrus referred Claimant for two consultative medical evaluations. (Tr. at 69). ALJ Andrus left the employ of the SSA before a decision in Claimant's case was issued; accordingly, a supplemental hearing was held on October 29, 2013 before the Honorable Andrew J. Chwalibog ("the ALJ"). (Tr. at 12, 28-44). Prior to the supplemental hearing, the SSA sent a Notice of Hearing to Claimant, which again attached the SSA's publication regarding a claimant's right to representation. (Tr. at 114-21). At the supplemental hearing, Claimant confirmed that she wished to proceed without representation. (Tr. at 30). By written decision dated December 17, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12-23). The ALJ's decision became the final decision of the Commissioner on February 11, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On April 16, 2015, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer and a Transcript of the Proceedings on

June 25, 2015. (ECF Nos. 9 & 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11 & 12). Accordingly, this matter is ripe for resolution.

## II.   Claimant's Background

Claimant was 41 years old at the time of her alleged onset of disability and 47 years old at the time of the administrative hearings. (Tr. at 32, 47, 54, 141). She has a GED and is able to communicate in English. (Tr. at 56, 159, 161). Claimant previously worked as a cabin housekeeper and supervisor for a state park and as a home health aide. (Tr. at 161, 178).

## III.   Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving disability, defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A). The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to establish, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the

severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 416.920a(d)(3).

In this case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since October 24, 2011. (Tr. at 14, Finding No. 1). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of vision loss and low back problems. (*Id.*, Finding No. 2). The ALJ also considered Claimant's allegations of plantar fasciitis, nephrolithiasis, leg pain, tailbone pain, headaches, anxiety (Post Traumatic Stress Disorder or "PTSD"), and depression; however, he found that these impairments were non-severe. (Tr. at 14-17).

At the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 17, Finding No. 3). Consequently, the ALJ determined that Claimant possessed the RFC to:

> [P]erform light work as defined in 20 CFR 416.967(b) except and [*sic*] can sit six to eight hours without interruption, can only stand four hours out of an eight-hour day, but only 45 minutes without interruption, can walk two hours out of an eight-hour day, but only 20 minutes without interruption. The claimant can frequently reach, handle, finger, feel, push and pull bilaterally, can frequently operate foot controls bilaterally, can occasionally climb ladders scaffolds [*sic*], and can frequently climb ramp [*sic*] or stairs, balance, stoop, kneel, crouch, crawl. She has limited depth perception (no acute binocular vision) and limited fields of vision. The claimant should avoid concentrated exposure to vibration, hazards, fumes, odors, gases, and pollutants.

(Tr. at 17-21, Finding No. 4). Based upon the RFC assessment, the ALJ determined at the fourth step that Claimant was unable to perform any past relevant work. (Tr. at 21-22, Finding No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's prior work experience, age, and education in combination with her RFC to determine if she would be able to engage in substantial gainful activity. (Tr. at 22-23, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1966 and was defined as a younger individual on the date that the application was filed; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination given that the Medical-Vocational Rules supported a finding that the Claimant was "not disabled," regardless of her job skills. (Tr. at 22, Finding Nos. 6-8). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy. (*Id.*, Finding No. 9). At the light, unskilled level, Claimant could work as a routing clerk or price marker, and at the sedentary, unskilled level, Claimant could work as a retail order clerk or inspector. (Tr. at 22-23). Therefore, the ALJ concluded that Claimant had not been disabled as defined in the Social Security Act from October 24, 2011 through the date of the ALJ's decision. (Tr. at 23, Finding No. 10).

## IV.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises two challenges to the Commissioner's decision. First, Claimant alleges that the ALJ failed to adequately advise her of "the benefits of obtaining legal representation in her Social Security case." (ECF No. 11 at 5). While Claimant acknowledges that she was advised of her right to representation at the first administrative hearing by ALJ Andrus, she contends that the ALJ failed to thoroughly explain her right to representation at the supplemental hearing. (*Id.*) Claimant asserts that the ALJ's offer to allow Claimant to obtain representation if she felt "in over her head" during the supplemental hearing was insufficient to meet the ALJ's duty to ensure that Claimant understood the benefits of legal representation. (*Id.* at 5-6). Claimant argues that she was "grossly ill-prepared to represent herself" as evidenced by "her failure to mention all of her impairments and request assistance obtaining additional medical evidence." (*Id.* at 6).

Second, Claimant maintains that the ALJ failed to adequately develop the record. (*Id.*) Claimant insists that the ALJ possessed a heightened duty to develop the record because she was unrepresented. (*Id.* at 6-7). Claimant asserts that the ALJ made several references to medical evidence missing from the record, including podiatry consultation notes from Dr. Stinehour, notes from psychological counselor David Clay, and treatment records concerning Claimant's allegation of headaches. (*Id.* at 7). Claimant contends that the ALJ should have inquired of her whether the record was complete and subsequently obtained any other relevant medical information. (*Id.*) Moreover, Claimant argues that the ALJ erred by failing to question Claimant regarding her mental impairments diagnosed by consultative examiner Emily Wilson, M.A. (*Id.*)

In contrast, the Commissioner responds that Claimant knowingly and

intelligently waived her right to representation at both the initial and supplemental hearings. (ECF No. 12 at 9). The Commissioner notes that Claimant was advised of her right to representation at both hearings and in three mailings sent to her prior to those hearings. (*Id.*) The Commissioner argues that Claimant has offered no evidence suggesting that she was incapable of understanding her decision to waive representation. (*Id.*) Moreover, the Commissioner asserts that Claimant had no difficulty understanding the hearing procedure and that Claimant stated in her Adult Function Report that she was able to understand and follow instructions. (*Id.*) In addition, the Commissioner contends that Claimant cannot establish that prejudice resulted from any error by the ALJ in advising her of the right to representation. (*Id.* at 10).

With respect to Claimant's second challenge, the Commissioner responds that both ALJ Andrus and the ALJ thoroughly questioned Claimant and repeatedly asked her whether she suffered from any other ailments that would affect her ability to work. (*Id.*) As for the purportedly missing medical evidence, the Commissioner points out that Claimant has not presented those records to the Court, and the Commissioner questions whether such records even exist. (*Id.*) Furthermore, the Commissioner insists that any additional medical records would not have changed the outcome of Claimant's case. (*Id.* at 11). On the subject of Claimant's foot impairment, the Commissioner notes that Claimant was not being treated for foot problems at the time of the supplemental hearing and that x-rays of Claimant's feet taken in September 2013 showed only mild osteoarthritis. (*Id.*) Additionally, the medical opinion evidence confirms that Claimant is able stand for at least four hours in an eight-hour workday and walk for at least two hours in an eight-hour workday. (*Id.*) Regarding any absent mental health treatment

records, the Commissioner emphasizes that Claimant stated in her October 2011 disability report that she was not receiving mental health treatment and Claimant reiterated the same at her July 2013 examination with William E. Waltrip, M.D. (*Id.* at 12). The Commissioner also asserts that Ms. Wilson's psychological findings were mostly unremarkable and that two state agency psychologists opined that Claimant's mental impairments were nonsevere. (*Id.*) Lastly, in relation Claimant's allegation of headaches, the Commissioner argues that Claimant did not testify she suffered from headaches at the administrative hearings. (*Id.* at 13). Moreover, the Commissioner contends that Claimant did not mention headaches during two consultative examinations and never mentioned headaches during her appointments at Ebenezer Medical Outreach. (*Id.*)

## V.   **Relevant Medical Records**

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence, but has confined its summary of Claimant's treatment records and evaluations to those entries most relevant to the issues in dispute.

### A. Treatment Records

On June 10, 2008, Claimant presented to Ebenezer Medical Outreach complaining of left foot pain following a surgery in April 2008 performed by Dr. Stinehour. (Tr. at 284). Claimant's physical examination was normal, and she was assessed with left foot pain. (*Id.*) Claimant was prescribed Ultram for her pain. (*Id.*)

Claimant returned to Ebenezer Medical Outreach on September 3, 2008 complaining of low back pain, low stomach pain, and frequent urination. (Tr. at 288). Upon examination, Claimant exhibited some costovertebral angle tenderness. (*Id.*) She was advised to increase her fluid intake. (*Id.*)

On October 7, 2008, Claimant was examined by Sara Lowe, RN, FNP, at Ebenezer Medical Outreach for complaints of pain in both feet and sleep disruption due to pain. (Tr. at 289-90). A review of systems was unremarkable other than plantar fasciitis of the right foot. (Tr. at 289). Claimant reported she had visited her podiatrist that day, who recommended that Claimant undergo surgery on her right foot the following week. (*Id.*) Nurse Lowe recorded that Claimant had the same surgery on her left foot in March 2008, with good results and pain relief. (*Id.*) Claimant was assessed with benign hypertension, resolved urinary tract infection, seasonal allergies, and right plantar fasciitis. (*Id.*) Claimant received prescriptions for Ultram, Allegra, and Singulair. (Tr. at 289-90).

On February 3, 2009, Claimant informed Nurse Lowe that she had visited the emergency room two days prior to her appointment complaining of back pain. (Tr. at 291). Claimant was informed at the emergency room that she had kidney stones, and she was given Lortab 5 for her pain. (*Id.*) At her appointment with Nurse Lowe, Claimant reported experiencing right flank pain that hurt with any movement. (*Id.*) Claimant requested a prescription for pain medication. (*Id.*) Nurse Lowe recorded that there was no costovertebral angle tenderness to palpation; however, Claimant complained of pain with any movement. (*Id.*) Claimant was diagnosed with nephrolithiasis (a four-centimeter stone in right kidney) as revealed by a CT scan taken the previous day. (*Id.*) Nurse Lowe advised Claimant to return to the emergency room if she required additional pain medication. (*Id.*) Nurse Lowe also noted that she would attempt to schedule an appointment for Claimant with a urologist. (*Id.*) Claimant was notified on February 11 of an appointment with Dr. Wyner, urologist, scheduled for March 4, 2009. (Tr. at 293).

On April 21, 2009, Claimant called Ebenezer Medical Outreach reporting a recent hospital visit due to kidney stones. (Tr. at 295). Claimant requested a prescription for

Phenergan because ibuprofen made her feel nauseous, and the prescription was written. (*Id.*)

Claimant returned to Ebenezer Medical Outreach on July 28, 2009 for follow-up and medication refills. (Tr. at 296-97). Claimant indicated that she was following with Dr. Wyner for her kidney stones and that she still had some kidney stones which had not passed. (Tr. at 296). A physical examination was normal with the exception of mild bilateral lower leg edema and a right eye prosthesis. (*Id.*) Claimant's mental status examination was normal. (*Id.*) Claimant was assessed with allergic rhinitis, edema of the lower extremities, leg pain, status post foot surgery for plantar fasciitis, and nephrolithiasis. (*Id.*) Nurse Lowe prescribed Allegra, Singular, Ultram, Rhinocort, and Hydrochlorothiazide.[1] (Tr. at 297).

On March 16, 2010, Claimant again treated with Nurse Lowe. (Tr. at 303-04). Claimant reported prior surgery to her right foot; however, she continued to experience pain in both feet, right worse than left. (Tr. at 303). She indicated that the pain was present when sitting and was exacerbated with walking. (*Id.*) In addition, she stated that the pain was unlike her prior foot pain as the pain was present on the top of the feet. (*Id.*) Nurse Lowe recorded that Claimant's physical examination was normal other than right foot pain with dorsiflexion and plantar flexion. (*Id.*) Claimant's mental examination was normal. (*Id.*) Nurse Lowe diagnosed Claimant with allergic rhinitis, benign hypertension, right foot pain, and history of nephrolithiasis. (*Id.*) Claimant was referred to Dr. Stinehour for a podiatry examination. (Tr. at 304).

On April 6, 2010, Claimant was examined by Dr. Stinehour for right foot pain.

---

[1] On August 18, 2009, Claimant completed a medical history form for the West Virginia Breast & Cervical Screening Program in preparation for a mammogram. (Tr. at 249). Under personal medical history and problem section, Claimant noted headaches.

(Tr. at 259). Claimant's varicosities and temperature gradient were within normal limits. (*Id.*) Dr. Stinehour assessed Claimant with a possible stress fracture of the right foot, and ordered an x-ray of Claimant's right foot. (*Id.*) Claimant returned to Dr. Stinehour on May 4, 2010 for complaints of pain on the top of her right foot. (Tr. at 260). Claimant was given a cortisone shot for neuropathy. (*Id.*)

On November 9, 2010, Claimant returned to Nurse Lowe. (Tr. at 236-37). Claimant complained of allergy symptoms, cough, headache, sinus congestion, nerves, insomnia, and fatigue. (Tr. at 236). She also reported experiencing symptoms of depression, including frequent "crying spells" during the previous four months. (*Id.*) Claimant indicated she was willing to talk to a counselor. (*Id.*) A review of systems was negative for back pain or abdominal pain. (*Id.*) Nurse Lowe's physical examination findings were unremarkable, other than post-nasal drip. (*Id.*) Claimant was assessed with benign hypertension, acute sinusitis, history of nephrolithiasis, and depressive disorder. (*Id.*) Nurse Lowe prescribed Levaquin and Celexa, and she referred Claimant to David Clay, psychological counselor. (Tr. at 237).

Claimant again visited Nurse Lowe on May 17, 2011 with complaints of headache and sinus pressure. (Tr. at 311). A review of systems was negative other than depression, sinus pressure, and jaw tenderness. (*Id.*) Nurse Lowe noted that Claimant had an artificial right eye, had 20/20 vision in her left eye, and treated with Dr. Gregory Browning for any eye issues. (*Id.*) A physical examination was negative other than sinus tenderness. (*Id.*) Claimant was assessed with allergic rhinitis, benign hypertension, depression, and acute sinusitis. (Tr. at 311-12).

On December 6, 2011, Nurse Lowe saw Claimant for a follow-up regarding Claimant's depression, tailbone pain, and chronic sinusitis. (Tr. at 238). Claimant

complained of depression and pain in her tailbone, which had been ongoing for the prior month. (*Id.*) Claimant stated that she experienced tailbone pain when sitting and that the pain worsened upon rising from a seated position. (*Id.*) In addition, Claimant reported suffering from sinus pressure, headache, facial and teeth pain, and left earache. (*Id.*) Upon physical examination, Claimant appeared to be in no acute distress. (*Id.*) Claimant exhibited sinus tenderness along with diffuse tenderness in her bilateral cervical anterior chains. (*Id.*) Claimant was assessed with acute upper respiratory infection, depressive disorder, and pain in the sacrum/coccyx area. (*Id.*) Nurse Lowe prescribed Celexa, Clarinex, Singulair, Ultram, and Rhinocort Aqua. (Tr. at 239). She also ordered x-rays of Claimant's sacrum/coccyx area. (*Id.*)

Claimant presented to Cabell Huntington Hospital on January 12, 2012 for an x-ray of her sacrococcygeal spine. (Tr. at 235). James K. Watson, M.D., interpreted the x-rays to be within normal limits. (*Id.*)

On May 8, 2012, Claimant reported to Nurse Lowe that she was experiencing worsening pain in her right foot. (Tr. at 412). She also continued to have pain in her tailbone area, which had been ongoing for six months and continued to increase. (*Id.*) Claimant indicated that standing after sitting for any length of time caused her "unbearable" pain. (*Id.*) She also stated that she had ridden horses for several years, but she could no longer participate in that activity due to pain. (*Id.*) Claimant informed Nurse Lowe that Ultram and Tylenol did not offer much relief. (*Id.*) A physical examination was unremarkable, except that Claimant was unable to move the fifth digit on her right foot. (*Id.*) Nurse Lowe assessed Claimant with allergic rhinitis, mixed hyperlipidemia, benign hypertension, continued pain in the sacrum/coccyx area, right foot pain status post-surgery on both feet, and depressive disorder. (Tr. at 412-13).

Claimant's medication regimen remained unchanged, and Nurse Lowe referred Claimant for orthopedic and podiatry consultations. (Tr. at 413).

Claimant again treated with Nurse Lowe on May 21, 2013. (Tr. at 416-17). Claimant reported experiencing fatigue for the previous four months. (Tr. at 416). Claimant informed Nurse Lowe that she was out of Celexa, but she wanted to restart taking it because it helped with her depression in the past. (*Id.*) In addition, Claimant remarked that she was having some vision changes and needed an eye examination. (*Id.*) Claimant also reported increased pain and stiffness in the joints of her hands, shoulders, hips, knees, and feet. (*Id.*) Claimant told Nurse Lowe that she had difficulty holding on to the steering wheel when driving, making the bed, washing dishes, and carrying out her activities of daily living. (*Id.*) She expressed constant feelings of being tired and generally unwell. (*Id.*) Upon examination, Nurse Lowe observed severe tenderness in the distal and proximal interphalangeal joints of both hands; however, Claimant exhibited no wrist pain and retained full range of motion in her wrists. (*Id.*) Nurse Lowe recorded that finger flexing caused Claimant discomfort and that Claimant had minor Heberden's nodes on several fingers. (*Id.*) Claimant was assessed with allergic rhinitis, chronic depression, and increased multiple joint pain and stiffness. (*Id.*) Nurse Lowe noted that she had questions about the etiology of Claimant's joint pain and stiffness. (*Id.*)

On July 25, 2013, Claimant presented to Dr. Browning for an eye examination. (Tr. at 458-59). He noted that Claimant suffered an injury to her right eye when she was nine years old, which resulted in a detached retina and loss of her eye. (Tr. at 458). With best correction, Claimant had 20/20 distant vision and 20/20 near vision in her left eye. (*Id.*) Without correction, Claimant retained 20/20-1 distant vision and 20/40 near

14

vision in her left eye. (*Id.*) Claimant was diagnosed with dry eye and blepharitis; however, Dr. Browning indicated that Claimant had no ocular disability due to retained OS function. (*Id.*)

Claimant presented to Cabell Huntington Hospital on September 4, 2013 for x-rays of her hands, bilateral feet, and bilateral wrists. (Tr. at 479-81). Joshua Gibson, M.D., recorded that the x-rays of Claimant's hands revealed osteoarthrosis diffusely in the interphalangeal joints; however, no acute fracture, dislocation, or erosions were seen. (Tr. at 479). Dr. Gibson noted that the x-rays of Claimant's wrists showed mild osteoarthrosis with no fracture or dislocation, and Claimant's carpal rows were intact. (Tr. at 481). As for Claimant's feet, the x-rays revealed mild osteoarthrosis, but no acute fraction or dislocation. (Tr. at 480). Claimant's bone mineralization was within normal limits. (*Id.*)

### B. Consultative Examinations and Opinion Evidence

On February 23, 2012, Emily E. Wilson, M.A., completed a Mental Status Examination of Claimant for the West Virginia Disability Determination Service. (Tr. at 319-25). Claimant reported that she had numerous limitations that prevented her from working, including an inability to stand or sit for extended periods due to pain in her tailbone, problems being around people, and panic attacks. (Tr. at 319). Claimant stated that she could drive, but only if someone rode with her given the loss of her right eye. (Tr. at 320, 322). Claimant indicated that her anxiety began when she was stabbed in the eye with a pencil at age nine. (Tr. at 320). She had not worked since 2006 or 2007 as a result of foot surgery and pain in her right foot due her toes being "out of line." (*Id.*) Regarding mental health treatment, Claimant reported symptoms of anxiety, including difficulty controlling worry, fatigue, and sleep disturbances. (*Id.*) In addition, Claimant

15

chronicled symptoms of depression, such as fatigue, sleep and appetite disturbances, weight loss and gain, feelings of guilt, inability to "have fun," strange thoughts, and temper issues. (Tr. at 321). She explained that these symptoms made her very agitated. (*Id.*) Claimant stated that she had not participated in counseling; however, she had taken psychotropic medications in the past. (*Id.*) Claimant also stated that she experienced daily headaches, with more severe headaches occurring three to four times each month. (*Id.*) With respect to activities of daily living, Claimant reported that she performed most activities independently, including caring for her hygiene and cooking. (Tr. at 322). On a typical day, Claimant described getting out of bed, letting her dog out, awaking her grandson, performing light chores, and cooking for her family. (*Id.*) Claimant expressed that she did not attend social gatherings. (*Id.*)

Upon examination, Ms. Wilson recorded that Claimant was cooperative and interacted appropriately with good eye contact except when talking about her family and ex-husband, which caused her to become tearful. (*Id.*) Claimant exhibited relevant and coherent speech, and she was oriented in all spheres. (Tr. at 322-23). Ms. Wilson noted that Claimant's mood was anxious and depressed, and her affect was consistent with her mood. (Tr. at 323). Claimant's thought process, thought content, perception, insight, and judgment were within normal limits. (*Id.*) Ms. Wilson observed that Claimant's concentration and immediate, recent, and remote memory were also within normal limits. (*Id.*) As to psychomotor activity, Claimant appeared fidgety, restless, and guarded; she clasped her hands tightly enough that her knuckles were white. (*Id.*) Ms. Wilson opined that Claimant's pace and persistence were within normal limits. (*Id.*) With respect to social activity, Ms. Wilson recounted that Claimant's interactions during the examination were normal and that Claimant reported speaking with her cousin daily.

(*Id.*) Claimant also stated that she was very close with her husband. (*Id.*) Ms. Wilson diagnosed Claimant with PTSD and panic disorder with agoraphobia. (*Id.*) Ms. Wilson based her diagnosis of PTSD on Claimant's multiple traumatic experiences as a child and an adult, and Claimant's remarks during the examination concerning feelings of numbness or impending doom. (*Id.*) The diagnosis of panic disorder resulted from Claimant's reports of "spells" of panic and persistent fears of suffering a panic attack. (*Id.*) Ms. Wilson concluded that Claimant's prognosis was poor given the chronic nature of her symptoms. (*Id.*) Ms. Wilson opined that Claimant would be able to manage any benefits that she may receive. (*Id.*)

On February 29, 2012, Robert Nold, M.D., examined Claimant's physical condition for the West Virginia Disability Determination Service. (Tr. at 327-32). Claimant complained of low back pain for the preceding six months that radiated into her hips and down her legs, with her right leg experiencing more pain than her left. (Tr. at 327). She also reported coccydynia and lumbar pain as well as a history of kidney stones. (*Id.*) Claimant reported undergoing a lithotripsy; however, she continued to suffer from right flank pain, occasional hematuria, episodes of urinary incontinence, and episodes of being unable to urinate. (*Id.*) In addition, Claimant informed Dr. Nold that she had a prosthetic right eye due to an injury as a child. (*Id.*) She also described a history of anxiety and depression. (*Id.*)

Upon physical examination, Claimant appeared to be in no acute distress. (Tr. at 328). Dr. Nold observed that Claimant did not wear corrective lenses and that her Snellen acuity examination result was 20/25. (*Id.*) Claimant's cervical spine exhibited a full range of motion. (*Id.*) Claimant's abdomen was soft, her kidneys were nonpalpable, and her bowel sounds were normal. (*Id.*) Dr. Nold noted no cyanosis, clubbing, or edema

17

in Claimant's extremities, and he recorded that Claimant's extremities appeared grossly symmetrical without evidence of atrophy. (*Id.*) Muscle bulk and tone of the extremities were normal. (*Id.*) Claimant could flex and extend her knees and elbows without difficulty. (*Id.*) Dr. Nold observed no swelling, redness, or tenderness of Claimant's joints. (*Id.*) Claimant could ambulate in a normal fashion, and Claimant retained full range of motion in her peripheral joints. (*Id.*) Dr. Nold recorded that Claimant's bilateral fist grip strength was 5/5. (*Id.*) Claimant's lumbar spine was able to flex forward sixty degrees and laterally flex twenty degrees on both sides. (Tr. at 329). A straight leg raising test in the seated position measured ninety degrees bilaterally while the same test in the supine position was sixty degrees bilaterally. (*Id.*) Dr. Nold noted that Claimant did not use an assistive device to aid in ambulation and that her gait was normal. (*Id.*) Claimant's cranial nerves were grossly intact, and her motor strength was 5/5 in all muscle groups. (*Id.*) Claimant exhibited difficulty walking on her heels and toes due to a prior foot issue. (*Id.*) She was able to tandem walk without issue, and she could perform one-half of a full knee squat without pain. (*Id.*) Dr. Nold recorded that Claimant's deep tendon reflexes were 1+ and equal bilaterally. (*Id.*) Claimant was fully oriented with normal mood and affect, and Dr. Nold found that Claimant related adequately to him. (*Id.*)

Dr. Nold diagnosed Claimant with low back pain, history of kidney stones, right eye injury with prosthetic eye on the right, history of foot problems, and history of anxiety and depression. (*Id.*) Dr. Nold opined that Claimant's primary problem was low back pain and coccydynia. (*Id.*) Dr. Nold remarked that Claimant's back pain was likely the result of "wear and tear." (*Id.*) He noted that Claimant had difficulty bending and would likely have issues in a work setting with bending and lifting items over thirty to

thirty-five pounds due to decreased mobility and low back pain. (*Id.*) Dr. Nold noted that Claimant reported right foot problems; however, there was no clear etiology for the problems. (*Id.*) Claimant exhibited a normal range of motion in her right foot during the examination, but she was unable to perform the heel or toe walk due to foot pain. (*Id.*) Dr. Nold determined this limitation might cause difficulty for Claimant in climbing up and down a ladder, traversing a number of stairs, or walking for an extended distance (over one block or so). (*Id.*) Dr. Nold also explained that Claimant may be limited in work activities that would require vision in both eyes. (Tr. at 330). Other than those specific limitations outlined by Dr. Nold, he concluded that Claimant appeared to be functionally intact. (*Id.*)

On March 9, 2012, Rosemary L. Smith, Psy.D., completed a Psychiatric Review Technique. (Tr. at 333-46). Dr. Smith found that Claimant's impairments of affective disorder (depression) and anxiety-related disorders (panic disorder and PTSD) were nonsevere. (Tr. at 333, 336, 338). Dr. Smith opined that Claimant had mild limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. at 343). Dr. Smith also observed that Claimant had no episodes of decompensation of extended duration. (*Id.*) She noted that the evidence did not establish the presence of the paragraph "C" criteria for Listings 12.04 and 12.06. (Tr. at 344). In the Consultant's Notes section of the form, Dr. Smith indicated that Claimant had no prior psychiatric or outpatient treatment other than prescriptions from her primary care physician. (Tr. at 345). Dr. Smith summarized Ms. Wilson's evaluation of Claimant and noted that a diagnosis of depression was supported by the record evidence, even though Ms. Wilson had not provided that diagnosis in her evaluation. (*Id.*) Dr. Smith acknowledged that Claimant had alleged problems with

memory and concentration in her Adult Function Report; however, Dr. Smith opined that Claimant's allegations were not entirely credible based on the results of the consultative examination and her activities of daily living. (*Id.*) Consequently, Dr. Smith determined that Claimant did not suffer from significant limitations in the areas of memory and concentration. (*Id.*) Lastly, Dr. Smith concluded that there was no evidence that Claimant experienced significant functional limitations as a result of any mental impairment. (*Id.*)

On March 13, 2012, Uma Reddy, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 347-54). Dr. Reddy listed Claimant's primary diagnoses as back strain and right foot injury with secondary diagnoses of kidney stones and loss of right eye. (Tr. at 347). As to exertional limitations, Dr. Reddy found that Claimant could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. (Tr. at 348). Dr. Reddy also indicated that Claimant retained unlimited ability to push or pull. (*Id.*) With respect to postural limitations, Dr. Reddy determined that Claimant could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl. (Tr. at 349). Dr. Reddy concluded that Claimant had no manipulative limitations. (Tr. at 350). Regarding visual limitations, Dr. Reddy determined that Claimant possessed limited depth perception and field of vision; however, Claimant was unlimited with near acuity, far acuity, accommodation, and color vision. (*Id.*) Claimant had no communicative limitations. (Tr. at 351). As for environmental limitations, Dr. Reddy opined that Claimant could have unlimited exposure to extreme cold, extreme heat, wetness, humidity, and noise. (*Id.*) However, Dr. Reddy indicated that Claimant should avoid concentrated exposure to

vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, such as machinery or heights. (*Id.*)

In discussing Claimant's symptoms, Dr. Reddy noted that Claimant had reported she could not stand or sit for long periods and could only lift approximately ten pounds due to back pain. (Tr. at 352). Dr. Reddy wrote that Claimant was a forty-five-year-old well-built female with a history of back strain and pain as well as a right foot injury that caused her some pain. (*Id.*) Dr. Reddy opined that Claimant was partially credible since there was medical evidence supportive of her alleged limitations; however, Claimant did not meet any listing limitations. (*Id.*) In addition, Dr. Reddy concluded that Claimant's kidney stones and loss of her right eye were not disabling. (*Id.*) Dr. Reddy found that Claimant's reported activities of daily living evidenced she could perform light work. (*Id.*) In the Additional Comments section of the form, Dr. Reddy summarized Dr. Nold's findings, a January 2012 x-ray of Claimant's sacrococcygeal spine, and a December 2011 treatment record from Ebenezer Medical Outreach. (Tr. at 354). Dr. Reddy noted that her findings concerning Claimant's limitations were not significantly different from Dr. Nold's findings. (Tr. at 353).

Debra Lilly, Ph.D., completed a Psychiatric Review Technique on May 12, 2012. (Tr. at 358-71). Dr. Lilly opined that Claimant's depressive disorder, panic disorder, and PTSD were not severe impairments. (Tr. at 358, 361, 363). Dr. Lilly also determined that Claimant's diagnoses of panic disorder and PTSD, which were assigned by Ms. Wilson, were not supported by Claimant's treatment notes. (Tr. at 363). Similar to Dr. Smith, Dr. Lilly found that Claimant was mildly limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. at 368). Dr. Lilly noted that Claimant had no episodes of decompensation of extended duration. (*Id.*)

There was no evidence establishing the paragraph "C" criteria for Listings 12.04 and 12.06. (Tr. at 369).

Dr. Lilly determined that the results of the consultative examination with Ms. Wilson did not support the limitations in concentration and memory reported by Claimant. (Tr. at 370). Dr. Lilly observed that, although Claimant reported that her depression was worsening, Claimant had not visited the free clinic where she had received care since December 2011. (*Id.*) Dr. Lilly remarked that Claimant's treating source diagnosed depression with no evidence that Claimant's complaints had increased. (*Id.*) Dr. Lilly also acknowledged that Claimant did not have any psychiatric referrals or hospitalizations. (*Id.*) Ultimately, Dr. Lilly opined that "the preponderance of the evidence reflect[ed] no severe functional deficits" and that Claimant was not credible regarding the severity of her alleged mental symptoms. (*Id.*)

On May 16, 2012, Caroline Williams, M.D., completed a case analysis on reconsideration. (Tr. at 380). Dr. Williams noted that Claimant alleged changes in her condition; however, there were no changes made in Claimant's medications when compared to those reported initially. (*Id.*) Dr. Williams opined that the new medical evidence in Claimant's file did not reveal any significant findings that would change the initial assessment. (*Id.*) Therefore, Dr. Williams affirmed Dr. Reddy's March 2012 Physical RFC Assessment as written. (*Id.*)

On July 24, 2013, William E. Waltrip, M.D., completed a History and Physical for the West Virginia Disability Determination Service. (Tr. at 461-64). Claimant reported to Dr. Waltrip that she was scheduled for a mental health evaluation concerning her depression, but she was not receiving treatment for her mental health at that time. (Tr. at 461). With respect to her physical condition, Claimant indicated that she suffered

from plantar fasciitis of both feet for the previous three to four years. (*Id.*) Claimant stated that undergoing surgery on both feet somewhat improved her symptoms. (*Id.*) Claimant also asserted that she had attended physical therapy and obtained shoe inserts for her foot condition; however, she was no longer using the inserts. (*Id.*) Claimant described experiencing back pain for six to eight years, which radiated into her right lower extremity, but was not constant. (Tr. at 462). Claimant reported that she was able to walk for fifteen to twenty minutes, sit for thirty to forty-five minutes, and shop at the mall and grocery stores. (*Id.*) Claimant stated that when seated, she frequently changed positions in order to obtain some pain relief. (*Id.*) Claimant informed Dr. Waltrip that she was not receiving treatment for her back pain at that time, and surgery had never been recommended as a treatment option. (*Id.*) Dr. Waltrip noted that Claimant's radicular leg pain stemmed from her low back problem. (*Id.*) Claimant also explained that she experienced occasional discomfort from kidney stone fragments that she had not passed. (*Id.*)

On examination, Dr. Waltrip recorded that Claimant did not exhibit any signs of memory loss. (*Id.*) He noted that Claimant possessed 20/50 vision in her left eye without correction. (*Id.*) Claimant exhibited no limitation with range of motion in her neck. (*Id.*) Dr. Waltrip observed no deformity, redness, or tenderness in Claimant's extremities. (Tr. at 463). Claimant's extremities displayed no loss of muscle mass or tone. (*Id.*) Dr. Waltrip recorded that Claimant was able to perform range of motion testing of the back without limitation, and Claimant's back exhibited no muscle tenderness or spasm. (*Id.*) Dr. Waltrip remarked that Claimant did not use an assistive device for ambulation, and her gait was normal. (*Id.*) Claimant's joints displayed no deformity, heat, tenderness, or redness. (*Id.*) Dr. Waltrip observed that Claimant could make a fist and that she

23

demonstrated good grip strength. (*Id.*) Claimant was also able to perform fine manipulation without limitation. (*Id.*) Dr. Waltrip found that Claimant had no loss of motor strength or loss of sensation to fine touch. (*Id.*) Claimant was able to walk heel-to-toe and tandem. (*Id.*) In addition, she could walk on the tips of her toes and her heels. (*Id.*) However, she was only able to perform a knee squat half of the way down. (*Id.*) Dr. Waltrip recorded that Claimant's deep tendon reflexes were present and normal. (*Id.*)

Dr. Waltrip's impression included a history of bilateral plantar fasciitis, chronic back pain with radiculopathy in the right lower extremity, a history of renal stones, a prosthesis in right eye, and status post laparoscopic gallbladder surgery and hysterectomy. (*Id.*) Dr. Waltrip remarked that Claimant's primary mental health issue was depression. (Tr. at 464). Dr. Waltrip opined that Claimant experienced minimal limitation with walking, standing, and sitting. (*Id.*) He concluded that Claimant was able to lift at least thirty pounds without limitation. (*Id.*) He found that Claimant possessed no limitations with hearing, seeing, and speaking. (*Id.*) In addition, Dr. Waltrip determined that Claimant could perform gross and fine manipulations. (*Id.*)

That same day, Dr. Waltrip completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). (Tr. at 465-70). He opined that Claimant could frequently lift or carry up to twenty pounds, and occasionally lift or carry up to fifty pounds; however, Claimant could never lift or carry anything over fifty pounds. (Tr. at 465). Dr. Waltrip determined that Claimant could sit for six to eight hours each day without interruption, stand for forty-five minutes without interruption, and walk for twenty minutes without interruption. (Tr. at 466). During an eight-hour workday, Claimant could sit a total of six to eight hours, stand a total of four hours, and walk a total of two hours. (*Id.*) Dr. Waltrip found that Claimant could frequently reach, handle,

finger, feel, push, and pull with either hand. (Tr. at 467). Claimant was also able to frequently operate foot controls with either foot. (*Id.*) As to postural activities, Dr. Waltrip opined that Claimant could frequently climb stairs or ramps, balance, stoop, kneel, crouch, and crawl; Claimant could occasionally climb ladders or ramps. (Tr. at 468). Dr. Waltrip acknowledged that Claimant had a prosthetic right eye; however, he opined that this did not cause a vision impairment. (*Id.*) With respect to environmental limitations, Dr. Waltrip indicated that Claimant could have frequent exposure to unprotected heights, moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme heat, extreme cold, and vibrations. (Tr. at 469). Dr. Waltrip also determined that Claimant could frequently operate a motor vehicle and be exposed to loud noises. (*Id.*) Lastly, Dr. Waltrip opined as to Claimant's ability to perform various activities. (Tr. at 470). He concluded that Claimant could shop, travel without a companion, ambulate without an assistive device, walk one block at a reasonable pace on a rough or uneven surface, use public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare simple meals, feed herself, care for her personal hygiene, and sort, handle, or use paper or files. (*Id.*)

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is

> evidence to justify a refusal to direct a verdict were the case before a jury,
> then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  Discussion

### A. The ALJ's Explanation of Claimant's Right to Representation

Claimant argues that the ALJ failed to adequately explain to her the benefits of obtaining legal representation at the supplemental hearing. (ECF No. 11 at 5). A claimant possesses a statutory right to counsel at an administrative proceeding under the Social Security Act. *Stahl v. Comm'r of Soc. Sec. Admin.*, No. 2:07cv19, 2008 WL 2565895, at *5 (N.D.W.Va. June 26, 2008) (citing 42 U.S.C. § 406; 20 C.F.R. § 404.971). To give effect to this right, "a claimant must be adequately informed of her right to counsel and

the availability of free counsel." *Id.* On the subject of advising a claimant of her right to representation, the SSA's Hearings, Appeals, and Litigation Law Manual ("HALLEX")[2] explains:

> If the claimant is unrepresented, the ALJ will ensure on the record that the claimant has been properly advised of the right to representation and that the claimant is capable of making an informed choice about representation.
>
> The ALJ is not required to recite specific questions regarding the right to representation or the claimant's capacity to make an informed choice about representation. However, below are examples of questions the ALJ could ask an unrepresented claimant on the record:
>
> • Did you receive the hearing acknowledgement letter and its enclosure(s)?
>
> • Do you understand the information contained in that letter, specifically concerning representation?

HALLEX I-2-6-52(B), Advisement of Right to Representation.

Nevertheless, a claimant is not required to be represented by counsel at a Social Security proceeding, and "lack of representation by counsel is not by itself an indication that a hearing was not full and fair." *Sims v. Harris*, 631 F.2d 26, 27-28 (4th Cir. 1980); *see also Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980) (stating "the Secretary has no duty to insist that claimant have counsel" in social security proceeding). In other words, lack of representation at an administrative hearing "is not in itself reason to upset the [Commissioner's] decision." *Marsh*, 632 F.2d at 300. Instead, a remand based on the absence of counsel is proper only "where the absence of counsel created clear

---

[2] HALLEX is a "manual in which the Associate Commissioner of Hearings and Appeals conveys guiding principles, procedural guidance and information to the office of Hearings and Appeals (OHA) staff." *Melvin v. Astrue*, 602 F. Supp. 2d 694, 699 (E.D.N.C. 2009). "The Fourth Circuit has not addressed whether a violation of HALLEX rules constitutes reversible error." *Pearson v. Colvin*, No. 2:14-cv-26, 2015 WL 3757122, at *30 (N.D.W.Va. June 16, 2015); *see also Way v. Astrue*, 789 F. Supp. 2d 652, 665 (D.S.C. 2011) (stating that Fourth Circuit has not decided "whether the Commissioner is bound by HALLEX."). The SSA's Program Operations Manual System ("POMS") similarly contains a section addressing an ALJ's duty to advise a claimant of her right to representation. POMS GN 03910.030, Advising Claimants Regarding Right to Representation.

prejudice or unfairness to the claimant." *Sims*, 631 F.2d at 28; *see also Berry v. Astrue*, No. 1:08-cv-5, 2009 WL 50072, at *13 (W.D. Va. Jan. 7, 2009).

In this case, Claimant was adequately advised of her right to representation at the administrative hearing stage, and she knowingly and intelligently waived that right. Prior to the administrative hearing before ALJ Andrus, Claimant was mailed a letter from the SSA informing her of her right to representation with an attached pamphlet explaining what a representative may do, how to choose a representative, and how much a representative may charge. (Tr. at 83-87). Also attached to the letter was a list of resources for obtaining a representative. (Tr. at 88-89). Additionally, before Claimant's first hearing, she was mailed a Notice of Hearing letter that again explained she possessed a right to representation. (Tr. at 101). The SSA pamphlet detailing the right to representation was also attached to that letter. (Tr. at 106-07). Claimant confirmed that she received these letters at her initial administrative hearing. (Tr. at 47). Likewise, prior to the supplemental hearing, Claimant was sent a Notice of Hearing letter explicating the right to representation and enclosing the SSA's right to representation pamphlet. (Tr. at 115, 120-21).

At Claimant's initial administrative hearing, ALJ Andrus thoroughly informed Claimant of her right to representation. (Tr. at 47). To the extent that Claimant could not afford an attorney to represent her, ALJ Andrus advised her that many of the attorneys in the area took similar cases on a contingency fee basis. (Tr. at 48). ALJ Andrus also notified Claimant that there was the possibility that a representative from the West Virginia Legal Aid Society may represent her without charge. (Tr. at 48-49). Next, ALJ Andrus explained to Claimant that a representative could obtain her medical records, ensure that she did not forget to testify about specific impairments, and make

legal arguments at the hearing. (Tr. at 49-50). ALJ Andrus then assured Claimant that whether she was represented would not alter his decision and that he would not be "angry" with Claimant if she wanted time to obtain a representative. (Tr. at 50-51). After ALJ Andrus's detailed description of the right to representation, Claimant testified that she understood that right. (Tr. at 52). When ALJ Andrus inquired whether Claimant wished to obtain a representative, Claimant replied, "No, that's okay." (*Id.*) At her supplemental hearing, Claimant confirmed that she wished to proceed without representation. (Tr. at 30). The ALJ notified Claimant that if she wished to obtain a representative at any point during the supplemental hearing, then she would be permitted to do so. (*Id.*) Claimant acknowledged that she understood, and never requested an opportunity to find a representative during the supplemental hearing. (*Id.*) The ALJ also informed Claimant about the hearing process and how he would determine whether Claimant was disabled. (Tr. at 30-31).

Given the numerous letters and pamphlets that Claimant received explaining her right to representation, the thorough explanation of Claimant's right to representation at her initial hearing, and Claimant's assertion on two separate occasions that she did not wish to have a representative, the Court **FINDS** that Claimant's waiver of her right to representation was knowing and intelligent. *See Mayes v. Astrue*, No. 3:08-cv-922, 2010 WL 3835595, at *6 (S.D.W.Va. Sept. 7, 2010) (finding claimant knowingly waived right to representation where SSA provided claimant with list of organizations who could provide him with free representation and administrative law judge twice informed claimant of right to representation in person), *report and recommendation adopted by* 2010 WL 3835597 (S.D.W.Va. Sept. 28, 2010). There is no evidence that Claimant did not understand her right to representation; on the contrary, Claimant confirmed at the

initial hearing that she understood her right after ALJ Andrus's careful commentary. Moreover, there is also no evidence that Claimant suffered from an intellectual disability that prevented her from appreciating the consequences of her decision to waive her right to representation. In fact, Claimant testified that she earned a GED; remarked in her Adult Function Report that she was able to follow written instructions "pretty good" and spoken instructions "alright"; and indicated at the supplemental hearing that she was able to understand what she read, possessed "good" writing ability, and understood basic math concepts. (Tr. at 33, 173).

The circumstances of this case are a far cry from those where the Fourth Circuit has determined that the absence of counsel required remand. For example, in *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981), the claimant had a fourth-grade education and provided a "barely-coherent, rambling monologue," during her nineteen-minute administrative hearing. The Fourth Circuit noted that the administrative law judge "made no effort to focus [the claimant's] testimony on relevant matters," instead the administrative law judge "simply waited for [the claimant] to exhaust herself and then concluded, 'Do you think that about covers your problems?'" *Id.* Accordingly, the Court had "no difficulty concluding that the administrative law judge failed in her duty 'scrupulously and conscientiously (to) probe into, inquire of, and explore for all the relevant facts' in this case involving an unrepresented, poorly-educated pro se claimant." *Id.* (quoting *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)).

Similarly, in *Sims*, the Fourth Circuit concluded that the claimant suffered prejudice from a lack of representation where "[i]t required over seven pages of transcript to establish claimant's name, age and address for the record," and the claimant "was confused about how to object to the medical evidence in her file and nearly

30

all of her own testimony concerning her medical problems was directionless and generally incoherent." 631 F.2d at 28. The Court also emphasized that the administrative law judge "was unfamiliar with claimant's former job duties and medical ailments and his inquiries failed to establish the nature of either with any specificity." *Id.*

Finally, the Court held in *Marsh* that the claimant was prejudiced by the absence of counsel where the claimant was illiterate, stopped attending school two months into the first grade, and "was completely unschooled on the requirements for proving his case." 632 F.2d at 296, 299. The Court observed that the claimant exhibited an "obvious lack of understanding of the evidence necessary to develop the critical issues" in his case. *Id.* at 300. The Court reasoned that the claimant was prejudiced by the absence of counsel because counsel would have obtained treatment records from the claimant's treating physicians, developed information about the claimant's epilepsy and the side effect of his epilepsy medications, acquired an electroencephalogram of the claimant, and objected to the administrative law judge's hypothetical question to the vocational expert that relied on incomplete evidence. *Id.*

Here, Claimant possessed a GED, was able to read and write, and provided coherent and relevant testimony related to her impairments at both hearings. She indicated at her initial hearing that she understood her right to representation, and she waived that right at both administrative hearings. Nothing in the record suggests that Claimant was incapable of a knowing and voluntary waiver or that Claimant was confused about the hearing process or the consequences of waiving her right to representation. Therefore, Claimant's first challenge to the Commissioner's decision fails.

## B. The ALJ's Duty to Develop the Record

Next, Claimant contends that the ALJ failed to fully develop the record. (ECF No. 11 at 6-7). Claimant insists that the ALJ's duty to develop the record was heightened because she was unrepresented during the administrative hearing process. (*Id.* at 7). In particular, Claimant asserts that the ALJ failed to inquire of Claimant whether the record was complete and subsequently obtain relevant medical records, including any records from Dr. Stinehour, psychological counselor David Clay, and any treater who documented Claimant's complaints of headaches. (*Id.*) In addition, Claimant argues that the ALJ erred when he failed to ask Claimant about the mental impairments diagnosed by Ms. Wilson during the administrative hearing. (*Id.*)

An ALJ has a duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  In the case of an unpresented claimant, an ALJ has "a duty to assume a more active role in helping [the] claimant[] develop the record," *Craig*, 76 F.3d at 591 (quoting *Sims*, 631 F.2d at 28), and must adhere to a "heightened duty of care and responsibility." *Crider v. Harris*, 624 F.2d 15, 16 (4th Cir. 1980) (quoting *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980)) (markings omitted). The Fourth Circuit has explained that an ALJ should "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Marsh*, 632 F.2d at 299 (citations and markings omitted). An ALJ may develop the record by subpoenaing and questioning witnesses, requesting records, or arranging physical or mental examinations or tests for the claimant. *Fleming v. Barnhart*, 284 F. Supp. 2d 256, 272 (D. Md. 2003).

An ALJ's failure to adequately develop the record warrants remand where the failure results in prejudice or unfairness to the claimant. *Sims*, 631 F.2d at 28; *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995); *Mann v. Astrue*, No. 5:07-201, 2008 WL 906346, at *17 (S.D.W.Va. Mar. 31, 2008). In other words, remand is improper, "unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000) (citations omitted).

In this case, the record was adequately developed by ALJ Andrus and the ALJ. After the initial hearing, ALJ Andrus requested Claimant's treatment records from Ebenezer Medical Outreach, and he also referred Claimant for two consultative medical evaluations, which she attended. (Tr. at 69, 458-59, 461-64, 476). In addition, physical and mental examinations performed for the West Virginia Disability Determination Service and state agency consultants' opinions were already contained in Claimant's file at the time of her administrative hearings. (Tr. at 319-25, 327-32). Furthermore, at the administrative hearings, the administrative law judges comprehensively questioned Claimant about her education, past work, daily activities, impairments, and physical limitations. Claimant's hearings lasted a total of approximately one hour. ALJ Andrus also repeatedly asked Claimant toward the end of the initial hearing whether there was anything else that Claimant wanted to add concerning her ability to "do things." (Tr. at 62-63). Near the end of the supplemental hearing, the ALJ likewise twice offered Claimant the opportunity to discuss any other health problems that were not addressed during her testimony. (Tr. at 39, 43). Lastly, the ALJ asked the vocational expert a hypothetical question favorable to Claimant at the supplemental hearing (though, the

ALJ did not ultimately adopt the limitations contained in the question). (Tr. at 43). Based on the foregoing facts, under the circumstances of this case, the undersigned **FINDS** that the administrative law judges collectively fulfilled their duty to fully and fairly develop the administrative record.

Furthermore, even assuming *arguendo*, that the record could have been more fully developed, Claimant has not established that she was prejudiced by the ALJ's error. Indeed, Claimant has failed to demonstrate to the Court that (1) additional medical evidence exists that the ALJ failed to obtain **and** (2) that the evidence would have altered the result of the proceeding. Claimant merely speculates as to the beneficial nature of any additional treatment records; however, "[m]ere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994). Claimant's failure to provide the purported medical records precludes any claim that such evidence would have prompted the ALJ to find additional physical or mental limitations affecting Claimant's ability to work. Furthermore, insofar as Claimant specifically alleges that the ALJ should have obtained additional treatment notes concerning Claimant's foot problems and mental impairments, the administrative record contains sufficient evidence related to those issues in the form of treatment records, evaluation findings, and medical opinion evidence, all of which the ALJ thoroughly reviewed in his written decision. (Tr. at 15-21). Finally, to the extent that Claimant insists that the ALJ should have developed her allegation of headaches, Claimant did not testify that she suffered from headaches at either administrative hearing, nor did she claim that she experienced headaches in her SSI application. (Tr. at 160). Moreover, as the ALJ recognized, Claimant's report of headaches to Ms. Wilson indicates that her headaches are often not

severe (Claimant rated the pain as a three out of ten), and Claimant's most painful headaches occur intermittently (three or four times each month).[3] (Tr. at 15, 321). For these reasons, the undersigned **FINDS** that Claimant has not demonstrated that she was prejudiced by any deficiency in the ALJ's development of the record. Thus, Claimant's second challenge to the Commissioner's decision is unconvincing.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to counsel of record.

**ENTERED**: May 2, 2016

Cheryl A. Eifert
United States Magistrate Judge

---

[3] Claimant's complaints of headaches typically coincided with reports of sinus pressure. (Tr. at 236, 238, 311).